**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 9:13-CV-80093-DMM**

DEBBIE LANZA, individually and on behalf
of all others similarly situated,

       *Plaintiff*,

*v.*

UPSCALE EVENTS BY MOSAIC, LLC
d/b/a THE MOSAIC GROUP, a Florida
limited liability company, PALM BEACH
MALL HOLDINGS, LLC, a Delaware
limited liability company, NEW ENGLAND
DEVELOPMENT, INC., a Massachusetts
corporation, and EASTERN REAL ESTATE,
LLC, a Delaware limited liability company.

       *Defendants*.

**PLAINTIFF'S RESPONSE IN
OPPOSITION TO DEFENDANT
PALM BEACH MALL HOLDINGS
LLC'S MOTION FOR SUMMARY
JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...............................................................................................................1

ARGUMENT .....................................................................................................................2

I.    PBMH Cannot Avoid Vicarious Liability by Relying on the *Mais* Decision and
       Feigning Uninvolvement in Mosaic's Conduct ...................................................3

       A.    Section 227(b)(1)(A)(iii) does not preclude vicarious liability, and
              PBMH's reliance on the *Mais* decision is unsupportable ......................3

              1.    The *Mais* Court lacked jurisdiction to determine the validity of
                     the FCC's 2008 Order ....................................................................5

              2.    The *Mais* Court erred by not deferring to the FCC's interpretation
                     of the TCPA that Section (iii) incorporates common law principles
                     of vicarious liability .......................................................................6

       B.    PBMH's agreement and relationship with Mosaic undermine its attempt
              to disclaim control and authority over Mosaic's unlawful practices ...............8

              1.    Mosaic acted pursuant to a written agreement through which
                     PBMH retained the right to control Mosaic's outreach services .........9

              2.    Even if the Court has doubts about whether there was a "formal
                     agency" relationship between PBMH and Mosaic, PBMH is still
                     vicariously liable because it ratified Mosaic's sending of text
                     messages ........................................................................................14

II.   PBMH's Attempt to Impose an "Expert Testimony" Requirement Fails Because
       Mosaic Admitted that it Used an ATDS .......................................................15

III.  PBMH's Attempts to Disclaim Knowledge of Mosaic's Unlawful Conduct
       Cannot be Reconciled with its Oversight of Mosaic's Text Spam Campaign ...........18

       CONCLUSION ...............................................................................................19

## TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970)........................................................................2

*Alabama v. N. Carolina,* 130 S. Ct. 2295 (2010) ........................................................................2

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984) .............6

*Meyer v. Holley*, 537 U.S. 280 (2003) ........................................................................................7

**United States Circuit Court of Appeals Cases**

*3 A's Towing Co. v. P & A Well Serv., Inc.,* 642 F.2d 756 (5th Cir. Unit A Apr. 1981)...............15

*Langfit v. Federal Mine Terminals*, 647 F.3d 1116, 1123 (11th Cir. 2011) ..................................11

*McDonald v. Hamilton Elec., Inc. of Florida*, 666 F.2d 509 (11th Cir. 1982) ..............................14

*Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859 (7th Cir. 1998)....................................8

*Ramos-Barrientos v. Bland*, 661 F.3d 587 (11th Cir. 2011)........................................................8

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009) ...........................................17

*Skop v. City of Atlanta, Ga.,* 485 F.3d 1130 (11th Cir. 2007) .........................................................2

**United States District Court Cases**

*Accounting Outsourcing, LLC v. Verizon Wireless Pers. Commc'ns, L.P.,*
     329 F. Supp. 2d 789 (M.D. La. 2004)..........................................................................4, 7

*Badillo v. Playboy Entm't Grp., Inc.*, 04-cv-591T30TBM,
     2006 WL 785707 (M.D. Fla. Mar. 28, 2006) .................................................................10

*Birchmeier v. Caribbean Cruise Line, Inc.*, No. 12 C 4069,
     2012 WL 7062748 (N.D. Ill. Dec. 31, 2012)..............................................................4, 7

*Bridgeview Health Care Ctr. Ltd. v. Clark*, No. 09 C 5601,
     2013 WL 1154206 (N.D. Ill. Mar. 19, 2013), *reconsideration denied in part*,
     09 C 5601, 2013 WL 4495221 (N.D. Ill. Aug. 21, 2013)........................................ *passim*

*Chavez v. Advantage Group*, No. 12-cv-02819-REB-MEH,
     2013 WL 4011006 (D. Colo. Aug. 5, 2013) ...................................................................5

*Clark v. Roberson Mgmt. Corp.*, 5:03-CV-274 (DF), 2005 WL 6345578
    (M.D. Ga. Jan. 11, 2005) ........................................................................................... 11

*Griffith v. Consumer Portfolio Serv., Inc.*, 838 F. Supp. 2d 723 (N.D. Ill. 2011) ................. 15, 16

*In re Jiffy Lube Intern., Text Spam Litig.*, 847 F. Supp. 2d 1253 (S.D. Cal. 2012) ........................ 8

*Lusskin v. Seminole Comedy, Inc.*, No. 12-62173-CIV,
    2013 WL 3147339 (S.D. Fla. June 19, 2013) ........................................................... 18, 19

*Mais v. Gulf Coast Collection Bureau, Inc.*, No. 11-61936-CIV,
    2013 WL 1899616 (S.D. Fla. May 8, 2013) ............................................................. *passim*

*Manfred v. Bennett Law, PLLC*, No. 12-CV-61548,
    2012 WL 6102071 (S.D. Fla. Dec. 7, 2012) ................................................................ 4, 7

*Mey v. Monitronics Int'l, Inc.*, 5:11-CV-90,
    2013 WL 4105430 (N.D.W. Va. Aug. 14, 2013) ......................................................... 9, 13

*Savanna Grp., Inc. v. Trynex, Inc.*, 10 C 7995, 2013 WL 4734004 (N.D. Ill. Sept. 3, 2013) ......... 9

*Stewart v. Regent Asset Mgmt. Solutions*, No. 1:10-CV-2552-CC-JFK,
    2011 WL 1766018 (N.D. Ga. May 4, 2011) ................................................................... 18

*Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079 (C.D. Cal. 2012) ............................... 4, 7, 8, 13

*U.S. v. Tianello*, 860 F. Supp. 1521 (M.D. Fla. 1994) .................................................................. 12

*Weiner v. Carnival Cruise Lines*, No. 11-CV-22516,
    2012 WL 5199604 (S.D. Fla. Oct. 22, 2012) .................................................................. 2

**United States Agency Decisions**

*In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C.R.
    14014, 14091 – 92 ..................................................................................................... 15, 16

*In the Matter of Joint Petition Filed by Dish Network LLC, the United States of Am.,*
    *& the States of California, Illinois, N. Carolina, & Ohio for Declaratory*
    *Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules,*
    28 F.C.C.R. 6574 (2013) ............................................................................................ *passim*

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection*
    *Act of 1991*, 23 F.C.C.R. 559 (Jan. 4, 2008) ................................................................... 4

**State Court Cases**

*Charvat v. Ryan,* 879 N.E.2d 765, 770 (Ohio 2007) ....................................................18

*Harper ex rel. Daley v. Toler*, 884 So. 2d 1124 (Fla. Ct. App. 2004) ...........................11

*Keith v. News & Sun Sentinel Co.,* 667 So.2d 167 (Fla.1995).......................................10

**United States Statutes and Rules**

28 U.S.C. § 2342 ...........................................................................................................5

47 U.S.C. § 402 .............................................................................................................5

Fed. R. Civ. P. 56 ..........................................................................................................2

Telephone Consumer Protection Act, 47 U.S.C. § 227 ........................................ *passim*

**Secondary Sources**

Restatement (Third) of Agency § 1.01 .........................................................8, 9, 11, 12

Restatement (Third) of Agency § 4.01 ........................................................................14

## INTRODUCTION

This case arises from Defendant Palm Beach Mall Holdings, LLC's ("PBMH") decision to have its third-party telemarketing partner, the Mosaic Group ("Mosaic"), send unsolicited text messages to the mobile phones of some 92,000 individuals, including Plaintiff Debbie Lanza, in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"). Plaintiff and PBMH have each moved for summary judgment. For its part, PBMH argues that it is entitled to summary judgment on the issues of whether it can be held vicariously liable for Mosaic's unlawful conduct and whether Plaintiff can prove the use of an automatic telephone dialing system ("ATDS"), as defined by the TCPA, without adducing expert testimony to support her claim. Each of PBMH's arguments fails and its motion for summary judgment should be denied.

PBMH's first argument—that it is not vicariously liable for its agent's conduct—fails on both the law and the facts. As legal support, PBMH relies entirely on a single, unpublished, district court opinion. In doing so, PBMH ignores the overwhelming weight of authority to the contrary, including decisions from the FCC, holding that ordinary tort principles of vicarious liability apply to Lanza's TCPA claims.

Likewise, PBMH's factual challenge to its vicarious liability—that it lacked the control and authority necessary to be held liable—fails for four reasons. First, the PBMH-Mosaic relationship was governed by a written contract, the terms of which directed Mosaic to send the text messages in question and establish that at all times Mosaic was acting as PBMH's agent. Second, that same contract gave PBMH the right to control the means and methods used by Mosaic, as well as Mosaic's day-to-day activities in furtherance of the text messaging campaign, Third, PBMH had the right to terminate the contract for any reason, with or without cause. And fourth, PBMH ratified Mosaic's unlawful conduct. While PBMH ignores each of these points,

1

they establish that if anything, summary judgment on the vicarious liability issue favors Lanza, and not PBMH.

Finally, PBMH's argument that Plaintiff needed expert testimony to prove that Mosaic used an automated telephone dialing system ("ATDS") to message 92,000 individuals is a red herring. Mosaic, PBMH's agent, admitted in terms nearly identical to those in the TCPA that it used an ATDS. Given such an admission, expert testimony is wholly unnecessary.

Because each of PBMH's arguments fails outright, its summary judgment motion must be denied.[1]

## ARGUMENT

Under Federal Rule of Civil Procedure 56, "summary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'" *Weiner v. Carnival Cruise Lines*, No. 11-CV-22516, 2012 WL 5199604, at *2 (S.D. Fla. Oct. 22, 2012) (quoting *Alabama v. N. Carolina,* 130 S. Ct. 2295, 2308 (2010)). In deciding a motion for summary judgment, "the Court must view the evidence in the light most favorable to the nonmovant and it may not weigh conflicting evidence to resolve disputed factual issues." *Id.* (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158 – 59 (1970); *Skop v. City of Atlanta, Ga.,* 485 F.3d 1130, 1140 (11th Cir. 2007)).

PBMH's motion for summary judgment fails for two reasons. First, the overwhelming weight of authority supports the proposition that a party may be held vicariously liable for conduct that violates the TCPA, and all the record evidence demonstrates that in carrying out the

---

[1]     Given the extensive dispositive briefing that has recently taken place in this case, (*see* Dkt. 80 (Defendant's summary judgment brief); Dkt. 83 (Plaintiff's memorandum in support of amended motion for class certification); Dkt. 85 (Plaintiff's summary judgment brief)), Plaintiff assumes the Court is familiar with the facts of the case. Accordingly, Plaintiff incorporates by reference the factual background section of her Motion for Partial Summary Judgment, which provide a sufficient background to analyze the issues raised here. (*See* Dkt. 85 at 2 – 3.)

offending text message campaign, Mosaic was PBMH's agent—at all times acting on its behalf and for its benefit. The facts further show not only that PBMH had knowledge of the text messaging campaign, but that it directed the campaign to happen and approved it when completed. As such, PBMH simply can't credibly argue that no genuine issue exists as to whether it can be held vicariously liable for the challenged conduct. Second, the record proves the subject calls were made using equipment that is on all fours with the statutory definition of an ATDS. Accordingly, PBMH is not entitled to judgment on that issue either. It's motion for summary judgment should be denied.

I.   **PBMH Cannot Avoid Vicarious Liability by Relying on the *Mais* Decision and Feigning Uninvolvement in Mosaic's Conduct.**

The bulk of PBMH's motion argues that it cannot be held vicariously liable for the fact that it paid a third party, Mosaic, to send over 90,000 unlawful text messages. As such, PBMH first argues as a matter of law that Section 227(b)(1)(A)(iii) of the TCPA ("Section (iii)") precludes vicarious liability, even though the FCC and all but one federal court to examine the issue uniformly agree that the TCPA allows it. Second, PBMH contends as a matter of fact that it is not vicariously liable for Mosaic's sending of the text messages, relying on certain after-the-fact characterizations of its relationship with Mosaic over the written and plain scope of the PBMH-Mosaic Agreement, which unequivocally demonstrates otherwise.

Both arguments fail. First, vicarious liability under Section (iii) is well established under federal case law and recent FCC orders, the most recent of which was issued on May 9, 2013. Second, the PBMH-Mosaic Agreement itself—along with PBMH's and Mosaic's expressed understanding of it—demonstrates that vicarious liability is, in fact, appropriate here.

A.   **Section 227(b)(1)(A)(iii) does not preclude vicarious liability, and PBMH's reliance on the *Mais* decision is unsupportable.**

As discussed in Plaintiffs' Motion for Partial Summary Judgment, (Dkt. 85 at 6 – 12),

PBMH is vicariously liable for Mosaic's unlawful conduct. With the exception of a single court, the FCC and every federal court to address the issue have agreed that parties may be held vicariously liable under Section (iii) for unlawful calls made on their behalf. *See*, *e.g.*, *Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079, 1084 (C.D. Cal. 2012); *Accounting Outsourcing, LLC v. Verizon Wireless Pers. Commc'ns, L.P.*, 329 F. Supp. 2d 789, 806 (M.D. La. 2004); *Bridgeview Health Care Ctr. Ltd. v. Clark*, No. 09 C 5601, 2013 WL 1154206, at *5 (N.D. Ill. Mar. 19, 2013) *reconsideration denied in part,* 09 C 5601, 2013 WL 4495221 (N.D. Ill. Aug. 21, 2013); *see also Manfred v. Bennett Law, PLLC*, No. 12-CV-61548, 2012 WL 6102071, at *3 (S.D. Fla. Dec. 7, 2012); *Birchmeier v. Caribbean Cruise Line, Inc.*, No. 12 C 4069, 2012 WL 7062748, at *1 (N.D. Ill. Dec. 31, 2012); *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 F.C.C.R. 559, 565 (Jan. 4, 2008) (hereinafter 2008 Order); *In the Matter of Joint Petition Filed by Dish Network LLC, the United States of Am., & the States of California, Illinois, N. Carolina, & Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules*, 28 F.C.C.R. 6574 (2013).[2]

That exception is the recent decision in *Mais v. Gulf Coast Collection Bureau, Inc.*, No. 11-61936-CIV, 2013 WL 1899616, *3 – 4 (S.D. Fla. May 8, 2013), where Judge Scola broke with precedent and decided not to follow a 2008 FCC Order making clear that vicarious liability was in fact available for Section (iii) suits. On May 9, 2013—the day after the *Mais* decision— the FCC issued another Order, which once again confirmed and further clarified the contours of

---

[2]     The FCC's *Dish Network* decision was issued on May 9, 2013, one day after the *Mais* decision. PBMH contends that *Dish Network* is inapposite because it dealt with claims under Sections 227(b)(2) and (b)(3), and not (b)(1)(A)(iii). (Def. Br. at 8 n.4.) PBMH's distinction is without merit, however. To start, *Dish Network* addressed claims under both § 227(b) and § 227(c). *See Dish Network*, 28 F.C.C.R. at 6584 – 91. Further, the *Dish Network* decision broadly recognized the availability of vicarious liability for *all claims* brought under § 227(b), and in no way limited its holding to claims under §§ 227(b)(2) and (3). *See* 28 F.C.C.R. at 6586 – 87.

vicarious liability for Section (iii) suits.

Not surprisingly, PBMH points to *Mais* as the (only) reason why vicarious liability is not available under Section (iii). But PBMH's reliance on *Mais* suffers from two fatal flaws: (1) the *Mais* Court lacked jurisdiction to determine the validity of FCC Orders, and (2) FCC interpretations of the TCPA (including Section (iii)) are entitled to deference.

> **1.     The *Mais* Court lacked jurisdiction to determine the validity of the FCC's 2008 Order.**

PBMH contends that the *Mais* Court properly refused to give any deference to the FCC's 2008 Order, ignoring the fact that district courts lack jurisdiction to determine the validity of FCC Orders in the first place. "Congress has vested in the federal courts of appeals 'exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), *or to determine the validity of*—all final orders of the Federal Communication Commission made reviewable by section 402(a) of Title 47.'" *Chavez v. Advantage Group*, No. 12-cv-02819-REB-MEH, 2013 WL 4011006, at *2 (D. Colo. Aug. 5, 2013) (quoting 28 U.S.C. § 2342(1)) (emphasis added). "Concomitantly . . . section 402(a) provides that '[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the Commission . . . shall be brought as provided by and in the manner prescribed' by 28 U.S.C. § 2342." *Id.* (quoting 47 U.S.C. § 402(a)).

Although the *Mais* Court went to great lengths to explain that it was not enjoining, setting aside, annulling, or suspending any ruling, it failed to explain how it did not "determine the validity of" a final FCC Order. *See Mais*, 2013 WL 1899616, at *6 – 9. Indeed, because it *did* analyze and ultimately disagree with the FCC's interpretation of the TCPA, the *Mais* Court, without jurisdiction to do so, necessarily "determine[d] the validity of" the FCC's 2008 Order. *See* 28 U.S.C. § 2342(1). At least one federal court has subsequently concluded that the *Mais* Court lacked jurisdiction to evaluate the FCC's Order, *see Chavez*, 2013 WL 4011006, at *2 – 3,

and the *Mais* Court itself recognized that at least seven others—including one in this District—have considered the same issue and found that district courts lack jurisdiction to review FCC Orders in cases of this kind. *See Mais*, 2013 WL 1899616, at *23 (amending previous order and certifying for appeal) (collecting authorities).

Accordingly, in refusing to follow the FCC's 2008 Order, the *Mais* Court improperly exercised jurisdiction to determine its validity.

> **2.      The *Mais* Court erred by not deferring to the FCC's interpretation of the TCPA that Section (iii) incorporates common law principles of vicarious liability.**

In addition to determining the validity of an FCC Order without jurisdiction to do so, *Mais* was also wrong in refusing to defer to the FCC's interpretation of the TCPA—i.e., that Section (iii) incorporates background common law principles of vicarious liability.

When determining whether to defer to an agency's interpretation of a statute that it is charged with the duty of implementing, courts apply the two-step process described in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 – 43 (1984). First, the court looks to whether Congress has specifically addressed the matter at issue, and "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* "If, however, the court determines that Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

In *Mais*, Judge Scola held that Congress directly addressed the question of vicarious liability under Section (iii) because other sections of the TCPA impose liability for calls made

"by or on behalf of" a party, while Section (iii) contains no such "on behalf of" language. 2013 WL 1899616 at *13. Judge Scola presumed that Congress must have had a reason for omitting the "on behalf of" language in Section (iii) while using it elsewhere in the TCPA, and held that the omission must mean that Congress intended there be no vicarious liability under Section (iii). *Id*. at *11 – 12.

But far from establishing that Congress spoke directly against vicarious liability, this analysis actually acknowledges that Section (iii) is literally silent as to vicarious liability. *See Thomas*, 879 F. Supp. 2d at 1083 – 84 (Section (iii) is "silent as to the issue of vicarious liability."). Given that the Supreme Court has explained that "when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules," *Meyer v. Holley*, 537 U.S. 280, 285 (2003), Section (iii) is, at the absolute worst, ambiguous as to vicarious liability.

Consequently, because Section (iii) is silent or ambiguous as to vicarious liability, courts must defer to the FCC's interpretation of Section (iii) so long as it is a permissible construction of the statute. Had the *Mais* Court proceeded to this step of the *Chevron* analysis, it should have, like numerous other Courts, found reasonable the FCC's interpretation that vicarious liability principles apply to Section (iii) claims. *See Thomas*, 879 F. Supp. 2d at 1084; *Accounting Outsourcing, LLC*, 329 F. Supp. 2d at 806; *Bridgeview Health Care Ctr. Ltd.*, WL 1154206, at *5; *In the Matter of Dish Network*, 28 F.C.C.R. 6574; *see also Manfred*, 2012 WL 6102071, at *3; *Birchmeier*, 2012 WL 7062748, at *1. These decisions more than demonstrate that the FCC's conclusions in its 2008 Order and its May 9, 2013 Order—that allowing for vicarious liability in Section (iii) suits would further both the purposes of the TCPA as well as Congress's intent— were permissible and entitled to deference.

In short, PBMH's attempt to escape vicarious liability as a matter of law rests entirely on the *Mais* case, which stands as an outlier among federal case law by holding that Section (iii) does not incorporate background common law principles of vicarious liability. And as discussed above, *Mais* cannot be followed because there the district court improperly exercised jurisdiction in determining the validity of an FCC Order, and failed to give proper deference to the FCC's interpretations of Section (iii). PBMH's contention that it cannot be held vicariously liable as a matter of law is therefore mistaken.

**B.    PBMH's agreement and relationship with Mosaic undermine its attempt to disclaim control and authority over Mosaic's unlawful practices.**

Recognizing that *Mais* is an outlier, PBMH argues that even if vicarious liability attaches under Section (iii), it still cannot be held vicariously liable for the text message campaign because it supposedly did not exercise sufficient control over Mosaic. (Def. Br. at 7 – 16.) Like all Congressional tort actions, the TCPA incorporates ordinary vicarious liability principles, meaning that "a seller may be held vicariously liable under federal common law principles of agency for TCPA violations committed by third-party telemarketers." *In re Dish Network, LLC*, 28 F.C.C.R. 6574, 6584 (May 9, 2013);[3] *see also Thomas*, 879 F. Supp. 2d at 1083 – 84; *In re Jiffy Lube Intern., Text Spam Litig.*, 847 F. Supp. 2d 1253, 1256 – 57 (S.D. Cal. 2012).

Federal courts adopt the Restatement of Agency as a source of federal common law principles of agency. *See, e.g.*, *Ramos-Barrientos v. Bland*, 661 F.3d 587, 600 (11th Cir. 2011); *Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859, 865 n.15 (7th Cir. 1998) (citing cases). Under the Restatement, an agency relationship exists where a principal and an agent agree that the agent shall act on the principal's behalf and subject to the principal's control. Restatement (Third) of Agency § 1.01. Control looks not to whether a principle continuously oversees each

---

[3]    As noted in Section I.A *supra*, FCC interpretations of the TCPA are binding on this Court.

decision of its agent, but rather whether "the principal is *capable of* providing instructions to the agent and of terminating the agent's authority." Restatement (Third) of Agency § 1.01 cmt. c. (2006); *Savanna Grp., Inc. v. Trynex, Inc.*, 10 C 7995, 2013 WL 4734004, at *6 (N.D. Ill. Sept. 3, 2013). Even PBMH acknowledges this point—i.e., that it is a principal's "right to control the manner and method of work carried out by the agent" that establishes the principal-agent relationship. (Def. Br. at 8 – 9 (quoting *Bridgeview*, 2013 WL 1154206, at *5).) What's more, the FCC has "made plain that 'on behalf of' liability does not require a formal agency relationship . . . [but may use] principles of ratification and apparent authority to establish . . . vicarious liability for the illegal acts of a third-party[.]" *Mey v. Monitronics Int'l, Inc.*, 5:11-CV-90, 2013 WL 4105430, at *4 (N.D. W.Va. Aug. 14, 2013) (citing *In re Dish Network, LLC*, 28 F.C.C.R. at 6584, ¶ 28).

Plaintiff has already established that she is entitled to summary judgment on the issue of vicarious liability. (*See* Dkt. 85 at 6 – 12.) But even if she is not entitled to summary judgment in her favor, PBMH's motion fails because the PBMH-Mosaic Agreement, which PBMH barely discusses in its brief, expressly authorized the text messages at issue and gave PBMH the right to control Mosaic's outreach efforts. What's more, after it had been carried out by Mosaic, PBMH ratified Mosaic's transmission of the text messages by paying for Mosaic's services. These facts, borne out in the record, preclude the entry of summary judgment in PBMH's favor.

      **1.**      **Mosaic acted pursuant to a written agreement through which PBMH retained the right to control Mosaic's outreach services.**

One glaring flaw in PBMH's argument that it can't be held vicariously liable for the text messaging campaign carried out by Mosaic is that it entirely discounts the written agreement at the center of its relationship with Mosaic. Instead, PBMH relies on self-serving "affidavits and deposition testimony submitted in this case" from its own witnesses, which—now that PBMH

faces potential class-wide liability—construe the PBMH-Mosaic relationship as one involving an independent contractor that enjoyed complete freedom to promote the Outlets. (Def. Br. 9 – 11.) Those self-serving characterizations, however, ignore at least four core (and undisputed) aspects of the PBMH-Mosaic relationship that demonstrate PBMH's capacity to control Mosaic's outreach efforts (including its use of text messaging) throughout the duration of the parties' relationship.

First, the Agreement, and its August 2012 addendum, lists specific "tools" (including "SMS/Text Messaging") that Mosaic was permitted to use to promote the Outlets. (Pl. SOF ¶¶ 3 – 13.)[4] And regardless of whether these "tools" were promises to perform, as the Agreement states, (Pl. SOF Ex. C – PBMH-Mosaic Agreement at 1 ("Our team *will* . . . Develop creative promotions (print, email, text, and auto calls)) (emphasis added)), or "a 'menu' of services that Mosaic could potentially utilize in its outreach efforts," as PBMH and Mosaic like to term them, (Def. Br. at 11), the result is the same and uncontested: Mosaic's ability to perform was dictated by the Agreement. PBMH could have structured the Agreement to give Mosaic complete discretion to act by simply stating, for example, that Mosaic would "perform outreach services." *See*, *e.g.*, *Mais*, 2013 WL 1899616, at *14 (contract for debt collection stating only that the hired debt collector would "perform third party collection services"). Likewise, the parties could have, but did not, (Pl. SOF ¶ 16), describe Mosaic's role as an "independent contractor" in the Agreement itself. *See*, *e.g.*, *id.* (contract stating that "[t]he parties expressly agree hereto that Gulf Coast is an independent contractor" was "evidence of the parties' intent") (citing *Keith v.*

_____

[4]     As used herein, "Pl. SOF" refers to Plaintiff's Local Rule 56.1 Statement of Material Facts submitted in support of her Motion for Partial Summary Judgment (Dkt. 86.)

*News & Sun Sentinel Co.,* 667 So.2d 167, 171 (Fla.1995)).[5]

Second, and consistent with the boundaries established by the Agreement itself, Mosaic understood that it lacked authority to use additional "tools" not pre-authorized by the Agreement. Rather, its use of any new and unspecified tools beyond those set out in the Agreement required separate and specific approval from PBMH. (Pl. SOF ¶ 15); *see Harper ex rel. Daley v. Toler*, 884 So. 2d 1124, 1131 (Fla. Ct. App. 2004) (finding that control over the means, rather than merely the results, of a project creates the control necessary for agency relationship).

Third, both PBMH and Mosaic were aware of and understood that PBMH retained ultimate authority over *all* of Mosaic's outreach efforts—even those pre-authorized by the Agreement. Thus, PBMH expected that Mosaic would follow its instructions if, for example, it told Mosaic not to utilize text messaging, and likewise, Mosaic understood that it was to follow all such instructions. (Pl. SOF ¶ 14; Pl. SOF Ex. B – Carabine Dep. at 57:16 – 58:9; Pl. SOF Ex. D – Sorrell Dep. at 25:10 – 28:2, 62:2 – 9); *see Harper*, 884 So. 2d at 1131.

Fourth, the Agreement expressly set out that PBMH had the unilateral right to terminate Mosaic's recruiting efforts at any time. (Pl. SOF ¶ 17.) Such unilateral right of a principal to terminate the services of its agent is textbook evidence of control. Restatement (Third) of Agency § 1.01 cmt. c; *see Langfit v. Federal Mine Terminals*, 647 F.3d 1116, 1123 (11th Cir. 2011) (recognizing "right to terminate" the relationship as one of several factors relevant to agency analysis).

---

[5]     *See also Badillo v. Playboy Entm't Grp., Inc.*, 04-cv-591T30TBM, 2006 WL 785707, at *7 (M.D. Fla. Mar. 28, 2006) (relevant agreement stated the contracting parties "are not and shall not be considered as joint venturers, partners, agents, servants, employees or fiduciaries of each other); *Clark v. Roberson Mgmt. Corp.*, 5:03-CV-274 (DF), 2005 WL 6345578 (M.D. Ga. Jan. 11, 2005) (relevant agreement stating that "WE both recognize our relationship as that of CARRIER and INDEPENDENT CONTRACTOR and not as an EMPLOYER–EMPLOYEE relationship").

Given the above, the PBMH-Mosaic relationship was hardly "hands off," as PBMH now tries to suggest. (Def. Br. at 14.) As such, because Mosaic's authority to act was detailed in the Agreement and both parties understood that PBMH retained the right to control Mosaic's conduct, it doesn't matter whether Mosaic initially "developed and [later] executed" the Agreement's outreach strategy, whether Mosaic decided not to use every "tool" pre-approved by the Agreement, or whether PBMH told Mosaic what actual text message to send. (*See* Def. Br. at 10.) What *does* matter is that the Agreement, and both parties' understanding of it, vested PBMH with the right to control Mosaic's outreach efforts. And it is the *right* to control, not the actual *exercise* of control, that matters. Restatement (Third) of Agency § 1.01 cmt. c ("A principal's failure to exercise the right of control does not eliminate it . . . ."); *see also U.S. v. Tianello*, 860 F. Supp. 1521, 1524 (M.D. Fla. 1994) ("Whether or not control is exercised by the principal is irrelevant; what is relevant is whether the principal has the right to control the agent's performance."). Thus, it makes sense that Mosaic didn't need to check in with PBMH before going forward with the "tools" authorized by the Agreement (*see* Def. Br. at 11)—because, of course, each was already authorized by PBMH in writing and could be used unless PBMH instructed Mosaic otherwise.

This evidence of control sets this case apart from any cited by PBMH in its summary judgment motion. *Mais*, for instance, is wholly distinguishable because it involved a services contract that (unlike here) characterized one party as an "independent contractor,"[6] which Judge Scola found relevant to the contracting parties' intent, *Mais*, 2013 WL 1899616 at *13 – 14, and, more significantly (and unlike here), because the agreement was completely "silent as to the

---

[6]     Section 8.1 of the services contract read "Independent Contractor Status . . . The Parties expressly agree hereto that Gulf Coast is an independent contractor." *Mais*, Case No. 11-cv-61936-RNS, Dkt. 121-10 at 6, ¶ 8.1. The Agreement, in contrast, states that Mosaic is a "Consultant." (Pl. SOF Ex. C – PBMH-Mosaic Agreement at 5.)

manner in which Gulf Coast would undertake the collection of debts . . . ." *Id.*[7] In fact, the only similarity between this case and *Mais* is that both contracts carried instructions that the performing party would act in accordance with all applicable laws. (Def. Br. at 13 (citing *Mais*, 2013 WL 1899616 at \*14).) But *Mais* gives no indication that such a provision was factored into that court's principal-agent determination at all, *Mais*, 2013 WL 1899616 at \*14, nor does PBMH present any other case stating as much.

    The other cases cited by PBMH fare no better: PBMH simply cannot shoehorn the facts of this case into the mold cast by *Taco Bell* (a decision that has since been criticized by the FCC as too narrow on its treatment of vicarious liability, *see In the Matter of Dish Network, LCC*, 28 F.C.C.R. at 6594 n. 124)), where there wasn't even a services contract to begin with[8] or *Mey*, where the plaintiff could not produce *any* evidence drawing a helpful connection between the defendant and its third party sales leads vendors.[9] Indeed, the only way PBMH is able to draw any similarity to *Taco Bell* or *Mey* is by disingenuously claiming that it "did not even know that

---

[7]    Section 1.1 of the services contract only read that Gulf Coast was to "perform third party collection services on referred accounts." *Mais*, Case No. 11-cv-61936-RNS, Dkt. 121-10 at 2, §1.1. The Agreement, in contrast, delineates how Mosaic is to perform under the Agreement. (Pl. SOF ¶ 15.)

[8]    In *Taco Bell*, the Court discussed that it was unlikely Taco Bell even knew about the text message campaign at issue, because none of the evidence produced by the plaintiff showed that Taco Bell either controlled or retained any right to control the advertising at issue. *Thomas v. Taco Bell*, 879 F. Supp. 2d at 1086 – 86. Indeed, PBMH's suggestion that "Taco Bell had approved a local advertising campaign and was aware that the advertising campaign would include text messaging," (Def. Br. at 14 (citing *Taco Bell*, 879 F. Supp. 2d at 1085)), is disingenuous at best. Instead, the *Taco Bell* Court reached exactly the opposite conclusion, finding that there was little, if anything, to even connect Taco Bell to the subject text message campaign.

[9]    In *Mey*, the plaintiff sought to hold the defendant vicariously liable for automated sales lead generation calls made on its behalf. But there, the Court noted that the *only* evidence produced by plaintiff suggested that the defendant's vendors had themselves "outsource[d] lead generation . . . to third parties with which [the defendant] had no relationship" at all, and the defendant was only "informed" (not "knew," as PBMH suggests, (Def. Br. at 16)) that its own vendors were using pre-recorded calls to generate sales leads. *Mey*, 2012 WL 4009718, at \*5.

Mosaic had ultimately decided to sent text messages . . . until after the fact." (Def. Br. at 16.) But even PBMH must admit the falsity of that claim, because before sending *any* text messages, Mosaic told PBMH no less than four times that it planned on using a text message campaign to promote the August 21st job fair—and PBMH enthusiastically responded to most of those communications. (Pl. SOF ¶¶ 18 – 27.) What's more, Mosaic sent PBMH reports during its promotion of the August 21st job fair, which *emphasized* that text messages were being sent. (Pl. SOF ¶ 24.) And again, PBMH expressed its approval of those efforts. (Pl. SOF ¶ 27.)

In the end, PBMH's insistence that it "empowered Mosaic to act independently," (Def. Br. at 16), is simply not supported by reliable record evidence. Instead, because the Agreement and available (unbiased) testimony clearly sets forth PBMH's capacity to control Mosaic's performance, summary judgment in favor of PBMH is not warranted.

> **2.     Even if the Court has doubts about whether there was a "formal agency" relationship between PBMH and Mosaic, PBMH is still vicariously liable because it ratified Mosaic's sending of text messages.**

An additional reason cementing PBMH's vicarious liability is the fact that it ratified Mosaic's sending of the text messages. The FCC has explained that vicarious liability under the TCPA includes "not only formal agency, but also principles of apparent authority and ratification." *In Re Dish Network, LLC*, 28 F.C.C.R. at 6584; *see also McDonald v. Hamilton Elec., Inc. of Florida*, 666 F.2d 509, 514 (11th Cir. 1982) ("A principal can ratify the unauthorized act of an agent purportedly done on behalf of the principal either expressly or by implication through conduct that is inconsistent with an intention to repudiate the unauthorized act."); Restatement (Third) of Agency § 4.01(2). Here, PBMH ratified Mosaic's sending of the text messages by conduct inconsistent with any intention to repudiate Mosaic's actions, namely by paying for the text messages.

To be sure, after sending out the text messages, Mosaic billed PBMH for the text-

message campaign on both an hourly and per-text message basis, which PBMH paid. (Pl. SOF ¶ 41.) Because paying Mosaic for sending out the text messages on its behalf is inconsistent with an intention to repudiate Mosaic's conduct, PBMH ratified Mosaic's sending of the offending text messages, and as a consequence, is vicariously liable for it. *See 3 A's Towing Co. v. P & A Well Serv., Inc.*, 642 F.2d 756, 758 (5th Cir. Unit A Apr. 1981) ("A ratification may be held to have occurred when corporate personnel with the authority to bind the corporation acquire, or are charged with, knowledge of the unauthorized act and fail to repudiate it within a reasonable period of time."). PBMH's ratification alone, then, is sufficient to warrant denial of its motion for summary judgment on the issue of vicarious liability.

**II.    PBMH's Attempt to Impose an "Expert Testimony" Requirement Fails Because Mosaic Admitted that it Used an ATDS.**

Next, PBMH suggests "Plaintiff cannot meet [her] burden" of "proving that Mosaic sent the text messages using an ATDS" because there is a "lack of clarity" as to whether an ATDS was used and, thus, an expert needed to opine on the issue. (Def. Br. at 17 – 18.) This argument misses its mark as well.

The TCPA defines an ATDS as any "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential generator, and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). The FCC has clarified that "[t]he statutory definition contemplates autodialing equipment that either stores or produces numbers," which includes equipment that can "create and dial 10-digit telephone numbers arbitrarily" or "relies on a given set of [stored] numbers." *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C.R. 14014, 14091 – 92 (2003) ("The basic function of such equipment [is] the *capacity* to dial numbers without human intervention."). Thus, the FCC "interpreted 'automatic telephone dialing system' to include equipment that utilizes lists or databases of known,

nonrandom telephone numbers." *Griffith v. Consumer Portfolio Serv., Inc.*, 838 F. Supp. 2d 723, 727 (N.D. Ill. 2011). That understanding fits precisely with one of the purposes of the TCPA: to prevent equipment from calling many wireless phone numbers in a short period of time without first obtaining consent. *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C.R. at 14092 (2003).

Here, contrary to PBMH's assertion, there is no "lack of clarity" as to whether Mosaic utilized an ATDS for its text messaging campaign—to be sure, the issue couldn't be clearer. It is undisputed that Mosaic "uploaded" some 92,000 cellular phone numbers into its equipment. (Pl. SOF ¶ 30.) Thus, the equipment clearly "ha[d] the capacity . . . to store . . . telephone numbers to be called," meeting the first element of the statutory definition of ATDS. 47 U.S.C. § 227(a)(1)(A). Likewise, it is undisputed that each of the 92,000 transmitted text messages was sent by Mosaic's equipment without further human intervention—Mosaic's own 30(b)(6) deponent admitted that he hit "go" and the equipment sent out the messages "one at a time." (Pl. SOF Ex. M – Smith Dep. at 9:3 – 10, 18:13 – 19:12.) Thus, the equipment clearly also "ha[d] the capacity . . . to dial such numbers," meeting the second element of the statutory definition. 47 U.S.C. § 227(a)(1)(B). *See also In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C.R. at 14091 – 92 (noting that the statutory definition of an ATDS "contemplates autodialing equipment that either stores or produces numbers" or otherwise has "the capacity to dial numbers without human intervention"). The equipment used here clearly had the capacity to do the two things required by the statutory definition of an ATDS (storing and calling), and it did each, thereby utilizing its capacity, and PBMH presents *no* evidence that the messages were sent by a method other than by ATDS. Contrary to PBMH's assertion, Plaintiff establishes that Mosaic spammed her using an ATDS.

16

Further, given the straightforward two-part ATDS statutory definition and the undisputed evidence that the equipment here falls within that definition, PBMH's insistence that an expert is needed is only a distraction. (*See* Def. Br. at 18.) While PBMH relies on *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009), for the supposed proposition that expert testimony is necessary to establish that any particular equipment meets the statutory definition of ATDS, *Satterfield* holds no such thing. Indeed, the *Satterfield* court treated testimony by an agent of the entity that actually sent the text messages as equal to the expert's, holding that the competing testimony created an issue of fact precluding summary judgment. 569 F.3d at 951.[10] Thus, the testimony of Mosaic itself, through its Rule 30(b)(6) designee Omar Smith, is perfectly sufficient to establish that the equipment used was an ATDS.

And while *Satterfield* found a disputed issue of material fact given the conflicting expert and fact witness testimony, no such conflict exists. The only "conflicting" testimony on this issue is that, as PBMH notes, "Mr. Smith could not confirm whether the equipment used by Mosaic constituted an ATDS." (Def. SOF ¶ 40.) His inability to do so was based on the facts that (1) he thought that an ATDS had to do with "robo calls" and "voice calls," (2) after being informed that "an [ATDS] could also be used with respect to text messages," his view of whether the equipment used by Mosaic was an ATDS became "skewed," and (3) he balked at offering his own "interpretation of the law." (Pl. SOF Ex. M – Smith Dep. at 44:7 – 45:22.) Thus, not only is summary judgment not warranted in PBMH's favor on the issue of whether an ATDS was used, all of the record evidence establishes that Plaintiff's should prevail on the issue.

In summary, Mosaic's own Rule 30(b)(6) witness confirmed that the equipment used by

---

[10]    In any event, the testimony provided by Mosaic's agent here was nearly identical to the testimony provided by the expert in *Satterfield*, i.e., that the telephone system at issue "stored telephone numbers to be called and subsequently dialed those numbers automatically and without human intervention." 569 F.3d at 951.

Mosaic meets all the statutory requirements of an ATDS. It "stored" 92,000 cell phone numbers. It automatically dialed each of those numbers "one at a time," causing the same text message to be sent 92,000 times. Nothing else is required under the TCPA, no expert is needed,[11] and PBMH's argument to the contrary fails.

**III.   PBMH's Attempts to Disclaim Knowledge of Mosaic's Unlawful Conduct Cannot be Reconciled with its Oversight of Mosaic's Text Spam Campaign.**

Finally, PBMH contends Plaintiff's allegation that "PBMH's violation of the TCPA was knowing and willful . . . is simply untrue and unsupported by the record." (Def. Br. at 19.) But that contention skirts any analysis of the law and outright misrepresents the facts.

While "[t]here is a split of authority as to what constitutes a willful or knowing violation" of the TCPA, courts in this Circuit have agreed that "to establish a *knowing* violation of the TCPA for an award of treble damages, a plaintiff must prove only that the defendant knew that it acted or failed to act in a manner that violated the statute, not that the defendant knew that the conduct itself constituted a violation of the law." *Stewart v. Regent Asset Mgmt. Solutions*, No. 1:10-CV-2552-CC-JFK, 2011 WL 1766018, at *7 (N.D. Ga. May 4, 2011) (quoting *Charvat v. Ryan,* 879 N.E.2d 765, 770 (Ohio 2007)); *see also Lusskin v. Seminole Comedy, Inc.*, No. 12-62173-CIV, 2013 WL 3147339, at *4 (S.D. Fla. June 19, 2013) (denying motion to dismiss as to defendant's willful violation of TCPA because allegations showed that "defendant [was] aware that it [was] placing a call using an automatic-telephone-dialing system, which happen[ed] to result in a violation of the TCPA—knowledge of the law being unnecessary."); *accord Bridgeview Health Care Ctr. Ltd.*, 2013 WL 1154206.

---

[11]      Of course, to the extent this Court believes an expert would be helpful during a jury trial (and assuming, of course, the Court does not grant Plaintiff's partial motion for summary judgment on this precise issue outright, *see* Dkt. 85 at 5), Plaintiff is happy to retain one to essentially restate Mosaic's own testimony and conclude that the software and machinery at issue qualifies as an ATDS.

Here, PBMH was aware of and even specifically contracted and paid for Mosaic's unlawful acts. PBMH says it had "no role whatsoever" in Mosaic's sending of text messages, (Def. Br. at 19), but ignores that it expressly contracted for those text messages to be sent. (Pl. SOF ¶¶ 3, 10.) PBMH says it was "not aware that Mosaic had decided to send text messages," (Def. Br. at 19), but forgets that it was told by Mosaic both that text messages were planned and that text messages were in fact being sent. (Pl. SOF ¶ 18.) And PBMH did not need to direct Mosaic to purposefully violate the law for its conduct to be "willful" under the TCPA, as PBMH suggests. (Def. Br. at 20.) Rather, it only needed to direct Mosaic to act in a way that happened to violate the TCPA, which is precisely what took place. *See Lusskin*, 2013 WL 3147339, at *4. All told, there's ample evidence to support the claim that PBMH's willfully violated the TCPA, and determination of this issue must be reserved for the ultimate trier of fact.

## CONCLUSION

For the foregoing reasons, this Court should deny PBMH's motion for summary judgment in its entirety.

Respectfully submitted,

**DEBBIE LANZA**, individually and on behalf of all others similarly situated,

Dated: September 19, 2013

By:  /s/ Stefan Coleman
      One of Plaintiff's Attorneys

Stefan Coleman, Esq. (#30188)
Law Offices of Stefan Coleman, LLC
201 South Biscayne Boulevard, 28th Floor
Miami, Florida 33131
Tel: 877.333.9427
Fax: 888.498.8946
law@stefancoleman.com

By:  /s/ Ari J. Scharg
      One of Plaintiff's Attorneys

19

Rafey S. Balabanian
Ari J. Scharg*
Benjamin S. Thomassen
EDELSON LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60604
Telephone: (312) 589-6380
rbalabanian@edelson.com
ascharg@edelson.com
bthomassen@edelson.com

* Admitted *pro hac vice*

*Counsel for Plaintiff and the putative class*

<u>**CERTIFICATE OF SERVICE**</u>

      I, Stefan Coleman, an attorney, certify that on September 19, 2013, I served the above and foregoing ***Plaintiff's Response in Opposition to Defendant Palm Beach Mall Holdings LLC's Motion for Summary Judgment***, by causing true and accurate copies of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system, on this 19th day of September, 2013.

                              /s/ Stefan Coleman_____